244 S.W.2d 10 (1951)
FORTNER
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 42107.
Supreme Court of Missouri, Division No. 1.
November 12, 1951.
Motion for Rehearing or to Transfer to Denied December 10, 1951.
*11 Mattingly, Boas & Richards and Lloyd E. Boas, all of St. Louis, for appellant.
Henry C. Stoll, Abraham Davis, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied December 10, 1951.
VAN OSDOL, Commissioner.
Action for personal injuries instituted by plaintiff, a child seven years old, who was struck by defendant's southbound Broadway streetcar as the car started forward from a regular stop at the intersection of North Broadway and Thrush Avenue in St. Louis.
The jury returned a verdict for plaintiff for $35,000, and defendant has appealed from the ensuing judgment.
Plaintiff's case was submitted to the jury by plaintiff's principal Instruction No. 1, which is as follows, "The Court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in the evidence the plaintiff alighted from defendant's southbound Broadway street car at the intersection of North Broadway and Thrush, and that after so alighting, plaintiff undertook to cross from the west to the east side of Broadway at said intersection in front of said street car, and that at said time the street car was at a standstill, and if you further find that while so crossing the street and when plaintiff was at a point in front of defendant's said southbound street car, if you find that he was, defendant's operator started the said street car in motion and that at said time the operator failed to exercise ordinary care to keep a reasonable lookout ahead, and that said street car struck and came into collision with plaintiff and injured him, if you so find, and if you further find that it was negligence on the part of defendant's operator to operate said street car in the manner aforesaid and that such negligence directly caused plaintiff's injuries, then your verdict must be in favor of plaintiff and against defendant."
Defendant-appellant contends plaintiff did not make out a submissible case. It is said there was no substantial evidence tending to show plaintiff was in a position where he could have been seen by the operator of the streetcar. It is argued that, if defendant's motorman could not have seen plaintiff, a failure to look could not have been the proximate cause of plaintiff's injury. Defendant-appellant makes a further and kindred contention of error of the trial court in giving Instruction No. 1. Defendant-appellant urges the evidence does not justify the conclusion, and the instruction does not hypothesize that defendant's operator, in the exercise of ordinary care in keeping a lookout, could have discovered plaintiff's perilous position. Defendant-appellant also contends the jury's award is grossly excessive.
*12 Defendant's streetcar tracks pass along North Broadway, a north-south street about fifty-five feet in width. Thrush Avenue, twenty feet wide between its curbs, approaches from the northeast and intersects the east side of North Broadway at an angle. Thrush Avenue at this point does not extend west of North Broadway. Defendant's streetcars southbound on North Broadway make a regular stop at Thrush. A safety zone about sixty feet long, provided for use of passengers of southbound streetcars, is situate on North Broadway west of the (west) southbound streetcar tracks. The south end of the safety zone is almost due west of the north curb of Thrush Avenue. It is about fifteen feet from the west edge of the safety zone to the west curb of North Broadway.
Plaintiff was injured a little after four o'clock in the clear afternoon of February 28, 1949. He and other children were returning from school. They boarded defendant's Broadway southbound streetcar at Halls Ferry Road. The streetcar was loaded with school children. Defendant's motorman had been accustomed "to picking up school children at that point" on that particular schedule or run. When the streetcar reached the intersection of North Broadway and Thrush Avenue it made the regular stop beside the safety zone. Plaintiff and three or four other children alighted from the rear exit door. The other children passed westwardly over to the west curb of North Broadway; but plaintiff walked southwardly within the safety zone and to the left (eastwardly) out in front of the streetcar. According to one witness, plaintiff passed along in front of the streetcar, but "kind of stopped, * * and then he walked across, and the minute he got in front of the street car he was out of my vision * * *. It was just a matter of a second when the street car started up with a jerk, it was like a double jerk. * * *" Another witness testified, "It happened so fast I would say I just saw him momentarily a few seconds before the impact * * *. He had taken a step or two and stopped in the south railthe east rail of the southbound tracks. * * * in a couple of seconds, it all happened so fast, the street car struck the boy." The latter witness testified the boy was "around three or four feet" in front of the streetcar.
Defendant's motorman, operator of the "new streamliner" streetcar involved, testified that when the children alighted he closed the exit doors, "looked in front to see if anything was in front," and slowly started the streetcar. There was an automobile making a left turn (southwestwardly) into North Broadway from Thrush Avenue, and "as the car was making a left turn I proceeded very slowly until I was sure he was out of my way." After the automobile was "straightened out" the motorman started "to go on" and heard a "slight bump" from under the center of the streetcar. The motorman further testified that, after the streetcar was stopped south of the intersection, the plaintiff was lying between the northbound and southbound tracks, about "in the center of Thrush."
An operator of defendant's "new streamliner" sits at the left front, but back three feet from the windshield. Upon cross-examination, the defendant's motorman testified that, from his normal seated operating position, he could not see the ground closer than twelve feet in front of the streetcar. In such position, he could not have seen a child of plaintiff's height if the child were standing any closer than "about seven feet" to the front of the streetcar. The operator had "never bothered to lean forward to see how near to the front of the car" he could observe objects such as small children, "or anything that might be crossing the tracks."
In examining the evidence in an endeavor to determine the questions of the submissibility of plaintiff's case and the propriety of giving plaintiff's Instruction No. 1, we see there was substantial evidence introduced tending to show that defendant's motorman had just discharged plaintiff from the streetcar, and plaintiff, having alighted, passed around and stood in front of the streetcar at a point just west of the east rail of the southbound track. Defendant's motorman looked "in front," *13 slowly started the streetcar, and then directed his attention to the automobile making a left turn into North Broadway from Thrush Avenue. When the automobile was "in the clear," defendant's motorman started on and struck plaintiff. In these respects the instant case is not like the case of Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663, cited by defendant-appellant, in which case there was no evidence tending to show that defendant truck driver had notice or knowledge plaintiff's decedent was anywhere in the vicinity; there was a substantial interval of time during which the movements of plaintiff's decedent were wholly unaccounted for; and there was no evidence whatever as to the relative positions and movements of plaintiff's decedent and defendants' truck immediately prior to the casualty.
In our case the inference may be clearly drawn that defendant's motorman, when starting the forward movement of the streetcar, was seated in his normal operating position and made no effort to examine the segment of street lying within "about seven feet" in front. The inference is justified that the operator started and moved the streetcar "blindly" into and through the space about seven feet wide in front of the streetcar; he did not take the precaution to lean forward and look down at an acute angle or otherwise place himself in a posture enabling him to examine the seven-foot area in front (within which area, he says, a child such as plaintiff may not be seen by one seated in the operator's normal operating position), although he had just discharged plaintiff and three or four other children at the regular Thrush Avenue stop.
Now there was no evidence tending to show the motorman, seated in his ordinary operating position three feet back of the windshield, could have seen plaintiff if plaintiff was standing three or four feet in front of the streetcar. And there was no evidence introduced tending to show the motorman, had he merely leaned forward, could have observed plaintiff. Yet, although plaintiff was standing not more than three or four feet from the streetcar (and assuming defendant's operator seated in his normal operating position could not see plaintiff), it is quite clear that if the operator, before he started the forward movement, had put himself in a position to see, he, in looking would have seen plaintiff standing there. Had he seen plaintiff, no doubt the motorman would not have then started the forward movement, and plaintiff would not have been injured. So it seems to us our primary question is not one of causation; rather it is one of negligence, more particularlywhat precaution in fulfilling a duty to keep a proper lookout ahead should defendant's operator have taken in the circumstances to protect plaintiff from harm?
"Negligence is ordinarily a question for the jury. It is always so when the evidence on material points is conflicting, or where, the facts being undisputed, different minds might reasonably draw different conclusions from them." Gratiot v. Missouri Pac. R. Co., 116 Mo. 450, 21 S.W. 1094, 1098, 16 L.R.A. 189; Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S.W.2d 58. Negligence depends upon the surrounding circumstances, as well as the particlar conduct involved, because an act or omission which would clearly be negligence in some circumstances might not be so in other situations. Rouchene v. Gamble Const. Co., supra; Kube v. St. Louis Transit Co., 103 Mo.App. 582, 78 S.W. 55, 59. "It is clear that, though the varied facts of different situations may not alter the legal standard of care required to avoid an accident, they often multiply the precautions that must be observed to comply with the standard; that is, to satisfy the law." Kube v. St. Louis Transit Co., supra. It is also true that the question whether acts or conduct measure up to the legal standard is to be considered in a relation to the opportunity of forecasting danger and knowing the need of obviating it. So it has been broadly stated that "ordinary care is a relative term, and its exercise requires precautions commensurate with the dangers to be reasonably anticipated under the circumstances." Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223, 228; Kube v. St. Louis Transit Co., supra. While defendant in the operation of *14 its streetcars is under the duty to exercise ordinary care (including the duty to keep a proper lookout) to avoid injury to all persons, including children, upon the streets, greater precautions are necessary to fulfill the duty to children of tender years than to adults. Simon v. Metropolitan St. R. Co., 231 Mo. 65, 132 S.W. 250; Kube v. St. Louis Transit Co., supra; 60 C.J., Street Railroads, § 351, p. 471.
In the instant case there is the fact or circumstance that defendant's operator, just before he started the forward movement of the streetcar, had discharged plaintiff and other young children from the streetcar onto the safety zone in the street. Should he not have known some one or more of the children, without the discretion of an adult, might move to the eastward and across in front of the streetcar? And he knew there was an area of the street in front which he could not see from his normal operating position. Would all reasonable minds agree defendant's operator was keeping a proper lookout ahead when he started the streetcar with no more than a mere look at the street in front while in a position from which he knew he could not see the sevenfoot area of the street immediately in front of the streetcar in which area one or more of the children he had just discharged might be? We think not.
It is our view that a reasonable man might say that, in the circumstances of this case, defendant's motorman, who in starting the streetcar had the duty to exercise due care in observing the street in front, should, in looking, have taken the pains to get into position so he could see the segment of the street lying within "about seven feet" in front, and ascertain if any of the school children he knew he had just let off were passing along or standing there. If so, the jury was properly authorized to find that defendant's operator was negligent in the operation of defendant's streetcar, specifically in starting the forward movement without exercising ordinary care to keep a reasonable lookout ahead; and that such negligence directly caused plaintiff's injuries, quite as submitted in the given Instruction No. 1, supra.
Instruction No. 1 plainly hypothesized that the operator started the streetcar in motion; that at the time the operator failed to exercise ordinary care to keep a reasonable lookout ahead; that it was negligence to operate the streetcar in such manner; and that such negligence directly caused plaintiff's injuries. The hypotheses omit no essential element of plaintiff's primary negligence case. There was an hypothesis of direct causal connection between the hypothesized negligence (in starting the streetcar without exercising ordinary care to keep a reasonable lookout ahead) and plaintiff's injury; and a finding of such negligence and such causal connection was essentially equivalent to the finding that had the motorman kept a proper lookout he could have seen plaintiff. In this case, in returning a verdict for plaintiff under the instruction, the jury had to find the motorman in the exercise of due care could have seen plaintiff. In Abernathy v. St. Louis Public Service Co., 362 Mo. , 240 S.W.2d 914, 920, an action in which plaintiff's case was submitted under the "vigilant watch" ordinance of St. Louis, the defendant-appellant contended plaintiff's principal instruction was erroneous in that it did not submit but assumed defendant's motorman saw or could have seen the automobile, in which plaintiff (respondent) was a passenger, in time to have avoided the collision if a vigilant watch had been kept. In disposing of the contention this court said that, under defendant's own evidence, the streetcar could have been stopped in time to avoid the collision after the time the defendant's motorman admittedly saw the automobile. However, this court further remarked that the instruction required the jury to affirmatively find that the operator failed to keep a vigilant watch for the automobile. This was "equivalent to saying that the motorman could have seen the automobile if he had kept a vigilant watch."
In a primary negligence case it should be sufficient if a jury is authorized to find that a defendant was negligent specifically in failing to keep a proper lookout (or as in the instant case, more specifically, if the jury is authorized to find that defendant was negligent in starting a *15 streetcar without exercising "ordinary care to keep a reasonable lookout ahead"), and that such negligence directly caused plaintiff's injuries. Nelson v. Evans, 338 Mo. 991, 93 S.W.2d 691; Lanio v. Kansas City Public Service Co., Mo.Sup., 162 S.W.2d 862; Abernathy v. St. Louis Public Service Co., supra. We think it unnecessary to submit the further hypothesis that by keeping a proper lookout defendant could have seen plaintiff. The instant case submitting the issue of primary negligence and causal connection is unlike a humanitarian negligence case wherein a defendant's failure to keep a lookout (primary negligence), where he had such a duty, is usually of no real significance. And, in a humanitarian negligence case an instruction should contain the submission of an essential element of the humanitarian rule, that is, defendant could have seen plaintiff (in imminent peril) in time to have averted the casualty. In respect to humanitarian negligence it is stated, "If there was a duty to keep a lookout, the question is could he (plaintiff) have been seen in time if it had been kept, and not was a lookout kept." Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S.W.2d 116, 124, cited by defendant-appellant; see also Banks v. Morris & Co., 302 Mo. 245, 257 S.W. 482.
As stated, defendant-appellant contends the verdict of $35,000 is grossly excessive.
After he was injured, plaintiff was taken to the hospital. He was given blood transfusions for shock and loss of blood; his wounds were cleansed and sutured; his many fractures of the bones were manipulated and some of them reduced; a "boot cast" was applied to the right lower leg; Kirschner wires were placed through the bones of the legs; and plaintiff was then placed in balanced traction.
Plaintiff had suffered fractures of the pelvis and left hip in the trochanteric region, including an intertrochanteric fracture of the femur, and fractures of the pubis and the ischium. The hip bones have not solidly united, and the result has been a permanent coxa vara deformity. There is a marked prominence of the left hip, and a two-inch shortening of the left leg. Plaintiff walks with a very noticeable limp. He walks with his left leg "turned out." He throws his "hip out" and the left foot "goes to one side as he walks." The condition of the left leg will not get better. The condition will "get worse," although it "would be hoped" corrective operative procedure "would tend to stop any increase in the deformity."
The plaintiff sustained multiple fractures of the bones of both feet. The feet were badly mangled. In March (1949), a gangrenous condition developed necessitating two operations by which the four lateral toes of the left foot and the three lateral toes of the right foot were amputated. By a later operation performed the following April, parts of the fourth and fifth metatarsal bones and some additional tissue of the left foot were removed. There is some resultant atrophy of the soft tissues of the feet.
Plaintiff also sustained comminuted fractures of the right femur and tibia and a transverse fracture of the fibula. The bones of the right leg have mended, but with imperfect alignment. The right leg is not as good as "before it was broken."
Plaintiff has and will continue to suffer pain in his left hip. The pain in the left hip is and will continue to be aggravated by activity. The feet have healed with scarring, and the scars are tender where subjected to the pressure of shoes.
A physician was of the opinion plaintiff's deformity will "affect his nervous makeup."
Plaintiff remained in hospitals until July 1, 1949. After being discharged, plaintiff used crutches for two months. He sometimes walks home from school. He can go up and down steps without assistance. He "moves faster than a walk at times," but he cannot participate in games with the boys"he can't keep up with them." Plaintiff is an average student. In some respects his school work has improved since his injury.
In the case of Margulis v. National Enameling & Stamping Co., 324 Mo. 420, 23 S.W.2d 1049, decided in 1929, this court *16 ordered no reduction of an award of $27,500 to plaintiff, a tailor forty-three years old. The injuries were to the plaintiff's right hip and leg and were somewhat comparable to the injuries to the left hip and leg of plaintiff herein. At the time of trial plaintiff Margulis had lost earnings which, with his hospital and surgical expense present and future, were in a total sum of $8,378, so that there remained $19,122 to otherwise compensate plaintiff. Apparently, plaintiff Margulis sustained no injury to his feet or to his left leg. In the case of McNatt v. Wabash R. Co., 341 Mo. 516, 108 S.W.2d 33, decided in 1937, the plaintiff, a brakeman thirty-four years old earning about $240 per month, suffered injuries to his left leg, foot and ankle, so that the left leg was totally disabled for ordinary use. He had no injury to his right leg or foot. There was a tenderness over the back at the waistline, and over both sacroiliac joints. The jury's award of $35,000 was ordered reduced to $20,000.
Plaintiff in the instant case, like plaintiffs in the Margulis and McNatt cases, sustained grave, painful and permanent injuries and will suffer pain in the future.
In the instant case plaintiff, because of the amputation of toes, has lost the lateral support of both feet, and his right leg is not "as good" as it was. He is obliged to walk through life with a painful and noticeable deformity. The condition of the left leg is progressive, in the absence of an operation which, it "would be hoped," would stop the increase of the deformity. In his very early age he faces the deprivation throughout life of the opportunity for usefulness and happiness in the possession of sound limbs and body. He must hereafter forgo active play and sports. It is true that in his youthful years he may be able to prepare for some gainful pursuit that requires no physical activity, but it is also true that he is permanently incapacitated from those pursuits which do require physical activity. These latter considerations and the fact that plaintiff sustained the painful permanent injuries, not only to his left hip and leg but also to both feet, in our view, when we consider the case with a regard to present economic conditions, reasonably balance the difference between the amounts of the awards approved in the Margulis and McNatt cases, decided in 1929 and 1937, to plaintiffs respectively forty-three and thirty-four years of age when injured, and the award in the instant case, decided now in 1951, to a plaintiff seven years old. The amount of an award is primarily within the discretion of the jury, and the trial judge in the instant case has approved the jury's verdict. The trial judge and the jury saw plaintiff and no doubt observed the extent of his deformity, and his manner of movement. Taking into account the factors to be considered in determining the question of excessiveness of awards, we cannot say that the award in the instant case is grossly excessive.
The judgment should be affirmed.
It is so ordered.
LOZIER, C., dissents in part.
COIL, C., concurs.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.
HOLLINGSWORTH and HYDE, JJ., and CONKLING, P. J., concur.
DALTON, J., concurs except as to amount of award.