# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**
## NO. 02-10-00474-CV


| | |
|---|---|
| HERITAGE OPERATING, L.P. D/B/A METRO LIFT PROPANE OF DALLAS | APPELLANT |
| V. | |
| RHINE BROTHERS, LLC, DFW PROPANE EXCHANGE, LLC, KENDALL L. RHINE, KENDALL T. RHINE, ANTHONY L. RHINE, JANICE RHINE, AND JAMES MARCUS WITHERS | APPELLEES |

----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

We have considered appellant Heritage Operating, L.P. d/b/a Metro Lift Propane of Dallas's (Heritage) motion for rehearing and appellees Rhine

---

[1]*See* Tex. R. App. P. 47.4.

Brothers, LLC, DFW Propane Exchange, LLC, Kendall L. Rhine, Kendall T. Rhine, Anthony L. Rhine, Janice Rhine, and James Marcus Withers's motion for rehearing and motion for reconsideration en banc. We deny the motions but withdraw our March 15, 2012 opinion and substitute the following.

Heritage appeals the trial court's take-nothing judgment in this case concerning breach of a covenant not to compete. We reverse and remand.

**Background Facts**

Appellee Kendall L. Rhine became an officer, director, and shareholder of Metro Lift Propane in 1997. At that time, Metro Lift had locations in Atlanta and Nashville. By 2003, Metro Lift had ten locations, including one in Grand Prairie. Kendall L.'s son, Anthony Rhine, ran the Grand Prairie Metro Lift location.

On January 1, 2004, Kendall L. and the other owners of Metro Lift sold Metro Lift's ten locations to Heritage. Heritage and the Metro Lift owners were all represented by counsel during the sales negotiations. Heritage paid $15,464,663.44 for the company. Kendall L. and the other former owners were offered positions with Heritage. Kendall L. declined.

As part of the sale, Kendall L. and the other former owners were asked to sign noncompetition agreements. Heritage agreed to pay Kendall L. $500,000 to sign the noncompete, paid out over five years. The agreement stated, in part,

> [Kendall L.] agrees that for a period of ten (10) years, commencing with the date of this Agreement, he will not:

2

(a) Engage in the business of the propane cylinder exchange business within a 75-mile radius of . . . any of the operations of [Metro Lift locations] (the "Restricted Area").

. . . .

(d) Furnish, divulge, or make accessible to anyone any confidential or proprietary information or trade secrets ("Confidential Information") concerning the Metro Lift Business including, but not limited to, customer identification, customer lists, business records and supply cost and pricing data. Notwithstanding the foregoing, such Confidential Information shall not include: (i) information that is or becomes generally available to [Kendall L.] on a non-confidential basis from a source other than Heritage or its affiliates provided that such source is not bound by an agreement of non-disclosure to Heritage.

(e) Provide to, arrange for, guarantee funds, or arrange for product supply or consumer tank or cylinder purchases to any person who engages [in the propane cylinder exchange business] in the Restricted Area.

(f) Be a member of a partnership or a stockholder, investor, officer, director, employee, agent, associate, or consultant, of any person, partnership, or corporation which does any of the acts described in the foregoing subparagraphs.

In "[l]ate 2008, early 2009," Kendall L.'s wife, Janice Rhine, began investing in propane cylinder exchange businesses owned and operated by Kendall L.'s sons, Kendall T. and Anthony Rhine, including DFW Propane, in Grand Prairie.[2] Kendall L. testified that his wife has not worked outside their home in forty years and does not possess much knowledge about running a

---

[2]Kendall T. and Anthony Rhine, as managers of Metro Lift locations, had also signed noncompetes in conjunction with the Metro Lift sale. Kendall T. had been restricted from North Carolina for five years, and Anthony was restricted from Texas for five years. Janice Rhine did not have a noncompete.

3

cylinder exchange business. Janice Rhine testified that at least one check she signed for DFW Propane came from a joint account she shared with Kendall L. She also testified that Kendall L. would write checks out of her living trust and that she would reimburse him by putting money back in his account. Kendall L. also wired $221,062.95 to a title company for the purchase of property for DFW Propane. Kendall L. wrote checks out to DFW Propane and had his wife sign them.

Heritage sued Kendall L., his sons, and his wife, among others, for breach of contract, trade secret misappropriation, interference with contract, tortious interference with contract and prospective business relations, civil conspiracy, and aiding and abetting. Heritage also sought an injunction against the Rhines. A jury found that Kendall L. violated his noncompete, that all of the defendants intentionally interfered with Kendall L.'s noncompete, and that the defendants conspired against Heritage, but that Heritage had suffered zero dollars in lost profits or loss of goodwill or reputation.[3]

The trial court then entered a judgment finding that the noncompete was unreasonable and thus, void. The trial court granted judgment in favor of the defendants and denied injunctive relief. The trial court made the following relevant findings of fact and conclusions of law:

---

[3]The jury also found that Anthony did not violate his noncompete and that no defendant misappropriated trade secrets. Heritage does not challenge these findings on appeal.

4

6.    The confidential information of [Metro Lift] consisted of customer identification and history, sales, inventory[,] and operational procedure.

7.    The confidential information of [Metro Lift] was neither complex nor difficult to independently obtain or create.

8.    The value, if any, of the confidential information of [Metro Lift] quickly eroded after the sale of [Metro Lift] to [Heritage] and was essentially non-existent two (2) years after the sale.

9.    The enforcement of Kendall L. Rhine's non-competition agreement beyond five years after the sale of [Metro Lift] to [Heritage] was not necessary to protect any legitimate business interest of [Heritage].

10.    The Kendall L. Rhine non-competition agreement was unreasonable in scope and time and greater than necessary to protect the goodwill and business interests of [Heritage].

11.    [The] Kendall L. Rhine non-competition agreement would be reasonable if limited to a time period not to exceed five (5) years.

12.    Kendall L. Rhine did not take any action prior to the fifth year anniversary of the non-competition agreement which violated its terms.

. . . .

1.    Kendall L. Rhine's non-competition agreement is reformed in that its term is reduced to five (5) years from the date of its execution.

2.    Permanent injunctive relief is neither warranted nor equitable under the facts of this case.

This appeal followed.

5

**Discussion**

## 1. The reasonableness of the noncompete

In its first issue, Heritage complains of the legal and factual sufficiency of the evidence supporting the trial court's finding that the limitations of the noncompete are unreasonable.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the

credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

In his motion for rehearing and motion for consideration en banc, Kendall L. Rhine argues that this court erroneously applied Texas law. The noncompete agreement contains a choice of law provision that states, "The laws of the State of Delaware shall govern this Agreement. The parties hereto agree and consent to the jurisdiction of the courts in the city and state in which [Kendall L. Rhine] resides to adjudicate all claims and controversies arising under this Agreement." As Rhine pointed out in his brief on appeal, Texas courts will enforce a choice of law provision unless it is contrary to Texas public policy. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991). The court must determine

> first, whether there is a state the law of which would apply under section 188 of the Restatement absent an effective choice of law by the parties, or in other words, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether this noncompetition agreement should be enforced; and third, whether that state's fundamental policy would be contravened by the application of the law of the chosen state in this case.

*Id*. at 678.

7

Delaware has a substantial relationship to the parties because Heritage's corporate offices are located there. However, Texas has a more significant relationship to the parties and the transaction because two of the ten Metro Lift locations from which Kendall L. Rhine was restricted were located in Texas and none of the locations were in Delaware.[4] Second, Texas has a materially greater interest than does Delaware in "protecting the justifiable expectations of entities doing business" in this state. *Id*. at 679 (refusing to apply a choice of law provision because Texas had a materially greater interest than Florida because Florida's interest in the contract was "limited to protecting a national business headquartered in that state"). Finally, in *DeSantis*, the supreme court explicitly stated that "the law governing enforcement of noncompetition agreements is fundamental policy in Texas." *Id*. at 681. Based on the factors outlined in *DeSantis*, we decline to apply Delaware law in this case.

The Covenants Not to Compete Act states,

[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

---

[4]The locations were Charlotte and Mooresville, North Carolina; Dallas and Grand Prairie, Texas; Houston, Texas; Louisville, Kentucky; Nashville, Tennessee; Epping, New Hampshire; Boston and Taunton, Massachusetts; New Orleans, Louisiana; St. Louis, Missouri; and Greensboro, North Carolina.

8

Tex. Bus. & Com. Code Ann. § 15.50(a) (West 2011). A covenant not to compete is a restraint of trade and unenforceable as a matter of public policy unless it meets a reasonableness standard. *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 662 (Tex. 1990); *Martin v. Credit Prot. Ass'n*, 793 S.W.2d 667, 668 (Tex. 1990). Whether an agreement not to compete is a reasonable restraint of trade is a question of law for the court. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991); *Martin*, 793 S.W.2d at 668–69. Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer. *DeSantis*, 793 S.W.2d at 681–82; *Henshaw v. Kroenecke*, 656 S.W.2d 416, 418 (Tex. 1983).

The trial court found that the noncompete was unreasonable in both scope and time. The only reformation the trial court made, however, was to the time period, and the trial court found that the noncompete would be reasonable if it were reduced to five years.[5] Thus, we will evaluate only whether the ten-year prohibition period is unreasonable.

---

[5]In his motion for rehearing and motion for reconsideration en banc, Kendall L. Rhine claims that the trial court "also reformed the agreement so as to specifically limit the scope of activity being restricted therein." But, as Rhine notes, the trial court's judgment states

> The Court . . . finds that the limitations set forth in the Non-Competition Agreement between [Heritage] and [Kendall L. Rhine] is unreasonable as to time and scope of activity and is greater than would be necessary to protect the goodwill and business interests of [Heritage]. [The] Non-Competition Agreement is reformed by reducing the period of limitation to five (5) years. The Court further finds that the scope of activity in Section 1(e) of the Non-Competition

We first note that it was Kendall L.'s burden to establish that the noncompete limitations were greater than was necessary. Tex. Bus. & Com. Code Ann. § 15.51(b) (West 2011) (stating that it is the promisor's burden to establish that the noncompete is not reasonable when the primary purpose of the agreement to which the covenant is ancillary is not to obligate the promisor to render personal services). To meet this burden, Kendall L. argued that the evidence was that any confidential information eroded in value quickly. However, Kendall L. has not addressed Heritage's claim that it also bought Metro Lift's goodwill.

Goodwill is a protectable, valuable interest, and parties may determine its value and contract for its sale. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011) ("Texas law has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are."). Goodwill is defined as a "business's reputation, patronage, and other intangible

Agreement is partially ambiguous and should be construed to include the language "engages in the propane cylinder exchange business" so that it reads as follows:

(e) Provide to, arrange for, guarantee funds, or arrange for product supply or customer tank or cylinder purchases to any person who engages in the propane cylinder exchange business in the Restricted Area.

The judgment clearly states that the only reformation made was to the time period. The trial court construed the scope of activity to include language that was unintentionally omitted from one of the six prohibited activities, but was identical to language in all of the other noncompete agreements. This change did not reduce the scope of activity.

10

assets that are considered when appraising the business, esp[ecially] for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets." Black's Law Dictionary 763 (9th ed. 2009).

Kendall L. presented evidence through a number of witnesses that some intangible interests (specifically, customer and pricing lists) eroded in the first five years after the sale, but he did not present evidence that *all* of Metro Lift's intangible interests eroded in the first five years. Tom Harlan, another former owner of Metro Lift, testified that any customer and pricing lists that were sold with Metro Lift would have no value after five years. Harlan was not asked about the value of Metro Lift's goodwill. The only evidence on goodwill came from Eric Beatty, chief legal officer of Heritage, who testified,

> [O]ne of those critical assets that Heritage can purchase is the future patronage of those customers. Goodwill. And one of the most critical concerns that I—I feel comfortable saying on behalf of Heritage is that we have the ability to ensure that we can protect that future patronage. And the only way to do that is to ensure that our seller, who knows that business infinitely better than we do for that location, will not come back in and take that goodwill right back.

Beatty testified that the parties valued Metro Lift's goodwill and other intangible assets at the time of closing and attributed $7 million of the purchase price to them.

A noncompete signed by an owner selling a business is quite different than one signed by an employee. *Marsh USA Inc.*, 354 S.W.3d at 790 n.5 (noting that section 15.50 does not address the "distinction between what type of agreement

11

is enforceable to protect goodwill in the context of the sale of a business and the context of a post-employment restriction"); *see Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 177 (Tex. 1987) (Gonzalez, J., dissenting) (noting that courts "scrutinize covenants not to compete in employment relationships more closely than covenants not to compete associated with the sale of a business"), *superseded by statute*, Tex. Bus. & Com. Code Ann. § 15.50(a).  Courts have been more inclined to enforce a long or limitless time period barring competition after a sale of a business.  *See, e.g.*, *Oliver v. Rogers*, 976 S.W.2d 792, 801 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (holding that a lack of a time limitation did not render noncompete unreasonable as a matter of law); *Greenstein v. Simpson*, 660 S.W.2d 155, 159 (Tex. App.—Waco 1983, writ ref'd n.r.e.) ("[A] person may agree[] in connection with the sale of his business[] not to re-enter a similar competitive business for the remainder of his life."); *York v. Dotson*, 271 S.W.2d 347, 348 (Tex. Civ. App.—Fort Worth 1954, writ ref'd n.r.e.) ("One may lawfully agree not to compete in a particular business, in a reasonably limited territory, during the remainder of his life.  Such contracts are held not to be in restraint of trade."); *Clay v. Richardson*, 290 S.W. 235, 236 (Tex. Civ. App.—Fort Worth 1926, writ dism'd w.o.j.) (upholding covenant of theater seller never to open a theater again in town where theater was located).

Kendall L. is "semiretired," does not live in Texas, and he has ownership interests in propane cylinder exchange companies in locations across the country, including Florida, Illinois, Indiana, and Alabama.  Kendall L. presented

12

no evidence of any great hardship borne by him by staying out of the Grand Prairie area, nor did he demonstrate any injury to the public that outweighs the legitimate benefits that the negotiated noncompete granted to Heritage. *See DeSantis*, 793 S.W.2d at 681–82 (noting that a noncompete is reasonable if neither hardship to the promisor nor public injury outweighs the covenant's legitimate benefits to the promisee).

Kendall L. was represented by counsel during the sale negotiations. He testified that although Heritage drafted the contracts, he and his attorney negotiated terms of the sale. He was aware that if he did not agree to a noncompete, there would be no deal with Heritage, and he did not think there was anything unfair about Heritage's request that he sign a noncompete. Kendall L. testified that he fully understood he would be bound by the noncompete and that he could open up propane cylinder exchange businesses anywhere in the country except within seventy-five miles of the listed prohibited cities. When asked at trial if he thought it was fair to him that he sign the noncompete, he responded, "Yeah, I got money for it." Heritage valued the intangible assets of Metro Lift at $7 million and had the former owners sign noncompete agreements to protect the value of those intangibles, including Metro Lift's goodwill. Kendall L. was paid half a million dollars separately from

13

the sale of the business to agree to the ten-year noncompete period, and Heritage has paid Kendall L. the agreed-to price.[6]

Based on the evidence described above, we do not believe that Kendall L. demonstrated that it was unreasonable of Heritage to protect its $7 million investment for a period of ten years. Nor, as discussed above, do we believe that a ten-year noncompete period is unreasonable as a matter of law when ancillary to a contract for the sale of a business. *See Oliver*, 976 S.W.2d at 801; *Greenstein*, 660 S.W.2d at 159. We hold that the evidence is legally and factually insufficient to support the trial court's finding that the limitations of the noncompete are unreasonable. We sustain Heritage's first issue.

## 2. Permanent injunction

In its second issue, Heritage argues that the trial court erred by refusing to enter a permanent injunction against Kendall L. to enforce the noncompete.

The noncompete agreement included a provision that allowed for injunctive relief. The provision read,

> [Kendall L. Rhine] agrees that the covenants contained in this section relate to matters which are of special and unique character which give Heritage peculiar value impossible of replacement, and for the lack of which Heritage cannot be reasonably or adequately compensated in damages . . . . [I]f [Kendall L. Rhine] should breach

---

[6]It would seem that if the noncompete were unenforceable, then the price paid for the unenforceable promise would also be unenforceable. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 177 (5th Cir. 1991) ("The covenant not to compete and the severance compensation clause were mutually dependent promises, and as such, the unenforceability of one necessarily rendered the other unenforceable.").

14

this Agreement, Heritage's damages will be difficult to determine, if not impossible to determine. Therefore, [Kendall L. Rhine] expressly agrees that in addition to the right to recover damages, Heritage shall be entitled to injunctive and/or equitable relief to prevent a breach hereof, and to secure the enforcement hereof.

The decision to grant or deny a permanent injunction is ordinarily within the sound discretion of the trial court. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

Under the common law, a party seeking an injunction must show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy. *Tom James Co. v. Mendrop*, 819 S.W.2d 251, 252 (Tex. App.—Fort Worth 1991, no writ). However, in its motion for rehearing, Heritage notes that if a party relies on a statute that defines the requirements for injunctive relief, then the express statutory language supersedes common law requirements. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 795 (Tex. App.—Houston [1st Dist.] 2001, no pet.). The Covenants Not to Compete Act provides for "damages, injunctive relief, or both" for a breach of a noncompete by the promisor. Tex. Bus. & Com. Code Ann. § 15.51(a). Thus, a party seeking injunctive relief under the Covenants Not to Compete act does not have to show irreparable injury for which he has no adequate legal remedy as a prerequisite to injunctive relief. *See Letkeman v. Reyes*, 299 S.W.3d 482, 486 (Tex. App.—Amarillo 2009, no pet.) ("It is enough simply to prove a distinct or substantial breach."); *see also* Tex. Bus. & Com. Code Ann. § 15.52 (stating that "the procedures and remedies . . . provided by Section 15.51 . . . are exclusive and

15

preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise").

We acknowledge that Heritage is correct that it did not have to show irreparable injury for which it has no adequate legal remedy in order to secure an injunction. However, because we are remanding the case for a new trial, we do not reach a conclusion on Heritage's second issue. On remand, the trial court will have the opportunity to review Heritage's request for injunctive relief again.

## 3. Damages

In its third issue, Heritage argues that the jury's finding that it suffered zero damages is against the great weight and preponderance of the evidence and is manifestly unjust. In response to four questions on damages, the jury awarded zero dollars. After trial, Heritage moved for the entry of judgment, requesting that the trial court disregard the jury's answers to the damages questions. Heritage also moved for a judgment notwithstanding the verdict and a new trial on the grounds that the $0 damage award was manifestly too small.

In reviewing an issue asserting that the jury's failure to make a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *In re King's Estate*, 150 Tex. 662, 665, 244 S.W.2d

16

660, 661 (1951). When there is objective evidence of injury, a jury's award of zero damages is against the great weight and preponderance of the evidence. *Horton v. Denny's Inc.*, 128 S.W.3d 256, 260 (Tex. App.—Tyler 2003, pet. denied); *Davis v. Davison*, 905 S.W.2d 789, 791 (Tex. App.—Beaumont 1995, no writ).

Heritage presented the testimony of Mark Rambin, a certified public accountant. Rambin reviewed the sales transactions and financial statements of Metro Lift from 2004 to mid-2010 and "certain financial information" from DFW Propane, and he rendered an opinion on Heritage's lost net profits from 2009 through the end of the noncompete period in 2013. DFW Propane produced in discovery eighteen sales contracts it had with former Heritage customers. In 2008, Heritage had made a net profit of $72,000 from those customers. Rambin then made a projection of what the future sales to those eighteen customers would have been from 2010 through 2013. He estimated that Heritage lost $287,970 in net profit from the loss of those customers. Rambin then applied a "discount" to "account[] for the risk that a business activity may not happen as it was projected to happen." The discount accounts for lost customers, changes in the economy, and "any variable that might impact the ability of the business to achieve its objectives." Rambin's adjusted lost net profit estimation was $235,202.

Kendall L. did not present a competing expert, but he did challenge Rambin's calculations because one of the companies with a contract with DFW

Propane, Ram Tool, did not ultimately buy its propane from DFW Propane. Rambin responded,

> I'm not certain it impacts [the projected lost net profits], because as I was able to see, those sales [to Ram Tool] did tail off. So Heritage lost that business. There's a contract showing that DFW [Propane] somehow had some contact with them and ultimately Heritage lost that business. So I'm not certain it has an impact on that calculation.

Kendall L. also implied that another former customer, Big D Clutch, was no longer in business. Rambin explained that it would not affect his calculation because "that's the type of thing that the discount rate and the fact that I didn't increase the sales adjusts for. Those types of business risks are part of that calculation." This "discount" he applied to his projection "takes into consideration the time value of money, the interest factor, as well as the business risk factor." He defined the business risk factor as "[a]ny type of uncertainty[] that a business might go out of business, the economy might change, different things might happen." Thus, he explained the discount rate accounted for companies like Big D Clutch going out of business.

Kendall L. presented testimony from five former customers of Metro Lift who had signed contracts with DFW Propane. All five former customers testified that they left Metro Lift for DFW Propane because DFW Propane offered a better price. Only two customers testified that they were actively looking for a new provider, and only one of those could testify that he recalled that he contacted DFW Propane before DFW Propane contacted him. The other three testified that DFW Propane solicited them. That DFW Propane offered a lower rate might

18

explain why a customer might have left Metro Lift for DFW Propane, but it is not any defense to Metro Lift's contention that it lost business because of DFW Propane's presence in its area. DFW Propane's own witnesses demonstrated that Metro Lift lost customers because DFW Propane took them. Even if Kendall L. challenged Rambin's methodology in making his future lost profit projections, Kendall L. did not challenge the evidence, including signed contracts produced by DFW Propane, that Metro Lift's former customers left Metro Lift for DFW Propane.

Thus, while there was evidence that not all of the contracts DFW Propane provided resulted in sales, there was uncontroverted evidence that Metro Lift did lose some sales to DFW Propane. *See D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ) ("A party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty."). Those contracts, along with Rambin's testimony on Metro Lift's financial records, also provided some evidence of how much profit Metro Lift lost from those customers. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) ("Recovery for lost profits does not require that the loss be susceptible of exact calculation.") (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). There is therefore some objective evidence of the damages Heritage suffered. *See Horton*, 128 S.W.3d at 260. Thus, after having considered the evidence admitted, we hold that the evidence is factually insufficient to support a finding of

19

zero damages, so as to be manifestly unjust, and we sustain that part of Heritage's third issue.[7] We do not, however, hold that Heritage proved the amount of its damages as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241 (noting that a "matter of law" issue "should be sustained only if the contrary proposition is conclusively established"). Although the contracts provide reasonably certain evidence of lost profits, Kendall L. disputed that all of the contracts led to sales. A lost profits calculation "is a fact intensive determination," *Holt Atherton Indus.*, 835 S.W.2d at 84, and it is not our province to "find facts," *Pool*, 715 S.W.2d at 634. Because we cannot say that Heritage established its damages as a matter of law, we cannot render a damages award. *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007) (nothing that when there is evidence to support some damages it is not appropriate to render judgment but it is appropriate to remand for a new trial).

On rehearing, Kendall L. Rhine argues that the trial court abused its discretion in failing to exclude Rambin's testimony. Rhine argues that Rambin's

---

[7]In his motion for rehearing and motion for reconsideration en banc, Kendall L. Rhine argues that by so holding, this court "has chosen to essentially act as 'jury number two' and substitute [our] judgment for that of the jury." Rhine assumes that the jury failed to award damages because it did not find Heritage's witnesses' testimony credible and that no evidence presented at trial establishes a causal link between Rhine's breach and Heritage's lost profits. Taking Rhine's assumption as true that the jury awarded zero damages because Heritage did not demonstrate causation, the testimony of Rhine's own witnesses who stated that they left Metro Lift for DFW Propane and Rambin's testimony that Metro Lift would have made a certain profit from those customers is evidence that DFW Propane caused Metro Lift to lose profits.

20

testimony was not reliable because it was based on speculation and not on objectively verifiable data.  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.  Expert testimony is admissible when the expert is qualified and the testimony is relevant and based on a reliable foundation.  *See Robinson*, 923 S.W.2d at 554.  Rhine only challenges Rambin's testimony on the grounds that it was not based on a reliable foundation.

Prior to trial, Rhine moved to exclude Rambin's testimony as unreliable because Rambin's opinion was based on "illustrations of potential lost profits" and based on clients that Heritage believed, but had not verified, that it had lost to Metro Lift.  Rambin's deposition testimony, attached to Rhine's motion to exclude and Heritage's response to the motion, shows that he had received historical sales information from Heritage and had requested sales information from DFW Propane, but had not yet received it.  Prior to his deposition, Rambin produced documents to Rhine demonstrating "how [he] would intend to calculate [a lost profit estimate] if—based on if we got the complete information."  He

21

explained, "I have not been provided with the detailed sales information for DFW Propane, and that—I believe that information is going to be more determinative of what DFW Propane has actually done and that would be more indicative of the lost profits that Metro Lift would have incurred relative to the matters at issue in this lawsuit." Rambin testified that he

> got the detailed sales information by customer, by transaction, for—I believe going back to sometime in 2005 to essentially the present and analyzed that information on a customer-by-customer basis, including the cost of sales, and analyzed persistency of customer relationships, the profitability of customer relationships, the volume of customer relationships.

The trial court overruled Rhine's objections. Right before trial, Rambin submitted revised calculations that included the "discount" rate. Rhine objected again, and the trial court overruled Rhine's objection again, stating, "If the only difference between his opinion as of before 30 days prior to trial and the supplement . . . is discount, I anticipate that that will probably be an area of cross-examination or rebuttal." On rehearing, Rhine objects to Rambin's testimony on the grounds that (1) Rambin's opinions were projections and not based on hard facts; (2) Rambin could not verify which customers actually moved their business to DFW Propane; and (3) Rambin "did not know the cost of propane in 2011, 2012, and 2013 or what Heritage's margins would be in the future."

Rambin's methodology of using Metro Lift's historical sales data before and after DFW Propane's entry into the market and then projecting Heritage's lost

future profits is an acceptable method for calculating lost profits. *See Swinnea*, 318 S.W.3d at 877 ("Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation."); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001) (noting that damages can be shown with reasonable certainty by a profit history or some other objective data such as future contracts); *White v. Sw. Bell Telephone Co.,* 651 S.W.2d 260, 262 (Tex. 1983) (noting that pre-existing profits are admissible to show projected lost profits with reasonable certainty). That Rambin, when he testified on October 22, 2010, could not foretell the cost of propane in 2011, 2012, or 2013 does not mean that his calculations are unreliable. Rambin used competent, historical data to compute past trends and to make estimations about future sales. This is more than mere speculation. *See Helena Chem. Co*., 47 S.W.3d at 506 (holding that evidence of past net profits coupled with facts and circumstances of future costs was sufficient to support award of estimated future profits). It is true that Rambin's calculations included customers that Heritage believed it lost because of Kendall L. Rhine's breach of the noncompete but, in fact, had not lost because of the breach. "Weaknesses of the facts, however, in support of an expert's opinion go to the weight of his testimony not its admissibility." *Tenngasco Gas Gathering Co. v. Bates*, 645 S.W.2d 496, 498 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.) (holding that trial court did not err in admitting expert testimony on value of property when expert based his opinion on the value of other, arguably similar

23

property). On cross-examination, Rhine properly challenged whether the customers in question left Heritage because of Rhine's breach of the noncompete. *See Swinnea*, 318 S.W.3d at 878 (noting that the defendant bears the burden of proving that "an otherwise complete lost profits calculation is in fact missing relevant credits"). Thus, we cannot say the trial court abused its discretion in admitting Rambin's expert testimony. We overrule Rhine's cross issue. Because we have sustained Heritage's third issue as to factual insufficiency, we do not need to address Heritage's fourth issue (regarding nominal damages) or fifth issue (regarding the exclusion of evidence). *See* Tex. R. App. P. 47.1; *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 665 (Tex. 2009) ("[N]ominal damages are not for compensation; they are for cases in which there are no damages, or none that could ever be proved.").

## Conclusion

Having sustained Heritage's first issue and part of its third issue, and having declined to reach its fourth and fifth issues, we reverse the trial court's judgment as to the reasonableness of the noncompete and as to damages. Our resolution does not disturb the jury's findings on liability. However, we are required to remand this proceeding for a new trial on liability and damages. *See* Tex. R. App. P. 44.1(b) (prohibiting a separate trial solely on unliquidated damages when liability is contested); *see also Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001) (stating party's failure to present on appeal an additional discrete challenge to liability when party challenges damages does not defeat plain

24

language of rule 44.1(b)). We therefore reverse the trial court's judgment and remand for a new trial.

LEE GABRIEL
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: June 21, 2012

25